UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| OLIVERA TUCAKOVIC, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | No. 4:18 CV 1426 DDN |
| ANDREW M. SAUL,[1] Commissioner of Social Security, | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Olivera Tucakovic for disability insurance benefits (DIB) and supplemental security income (SSI) benefits under Titles II and XVI of the Act, 42 U.S.C. §§ 401-434, 1381-1385. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the final decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born on November 30, 1963, and was 52 years old at the time of her alleged onset date. (Tr. 57.) She filed her application for DIB benefits on November 24, 2015 (Tr. 138-48) and for SSI benefits on January 16, 2016. (Tr. 149-59.) She alleged a June 12, 2015 onset date and alleged disability due to rectal/colon cancer and

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this action. No further action needs to be taken to continue this suit. 42 U.S.C. § 405(g) (last sentence).

hemorrhoids. (Tr. 57.) Her application was denied, and she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 73-74.)

On February 23, 2018, following a hearing, an ALJ issued a decision finding that plaintiff was not disabled under the Act. (Tr. 18-30.) The Appeals Council denied her request for review. (Tr. 1-6.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. ADMINISTRATIVE RECORD

The following is a summary of plaintiff's medical and other history relevant to her appeal.

On March 23, 2015, plaintiff underwent a colonoscopy and was subsequently diagnosed with adenocarcinoma with a small polyp nearby that was also cancerous. (Tr. 263, 266.) On June 16, 2015, plaintiff underwent laparoscopic low anterior colon resection at SSM Health DePaul Hospital. (Tr. 663.) She was discharged on June 21, 2015.

On June 29, 2015, plaintiff was treated in the emergency room for rectal pain from hemorrhoids. She complained of intermittent streaks of blood in her stool with mild abdominal cramping. (Tr. 375.)

On July 1, 2015, plaintiff was seen for post-operative evaluation. She continued to complain of constipation, severe rectal pain with bleeding, stomach pain, and nausea. Examination revealed a large external prolapsing hemorrhoid. Dr. Morin M. Hanson, a colon and rectal surgeon, recommended an urgent hemorrhoidectomy, surgery to remove hemorrhoids, and referral to oncology for treatment of Stage III anorectal cancer and chemotherapy. (Tr. 317.)

On July 13, 2015, plaintiff was seen in the emergency room at Barnes-Jewish St. Peter's Hospital for rectal pain, weakness, and syncope or fainting. She had had chronic diarrhea and worsening rectal pain since her surgery. She was nauseated and was having

difficulty eating and drinking. (Tr. 287.) She was diagnosed with syncope, abdominal pain, diarrhea, and history of colorectal cancer. She was discharged the same day with Percocet, for pain. (Tr. 297, 305.)

From July 17 to 23, 2015, plaintiff was hospitalized at DePaul Health Center for nutritional support, hydration, pain control, and sitz baths after being diagnosed with "failure to thrive." (Tr. 318, 21.) On exam she was weak and pale with three non-healing, swollen, hemorrhoid wounds. She underwent a hemorrhoidectomy. (Tr. 332.)

By July 28, 2015, plaintiff's appetite had improved and she had no nausea. She was having bowel movements, but they were painful. She continued to report occasional pressure in her rectal area, occasional bleeding, and occasional constipation. (Tr. 323-25.)

On August 7, 2015, plaintiff began chemotherapy treatments. (Tr. 861.) She reported being constipated for the past four days and was having trouble passing urine. (Tr. 987.)

On August 9, 2015, her side effects from chemotherapy included appetite change, weight loss, bleeding, weakness, fatigue, night sweats, shortness of breath, constipation, dizziness, and sleep issues. (Tr. 1156-57.) On August 27, 2015, she had complaints of constipation. (Tr. 876.) On September 8, 2015, her doctor noted she felt the same. (Tr. 1180-81.)

On September 12, 2015, plaintiff received additional chemotherapy. She continued to feel poorly with frequency of stools, pain in the perianal area, and cold intolerance. (Tr. 1178-80.)

On September 24, 2015, plaintiff reported she had felt great the previous day, although she felt terrible that morning. (Tr. 933.) The next day she reported feeling tired after chemotherapy. She said she needed a laxative to have a bowel movement. She felt pain and swelling in her rectal region and excessive gas and some urgency with bowel movements. (Tr. 326.)

On October 6, 2015, plaintiff received additional chemotherapy. She experienced weakness, fever and chills, bruising, hot flashes, shortness of breath, constipation, rectal pain, myalgia, dizziness, headaches, sleep issues, and hair loss. (Tr. 689, 1199-1200.)

On October 8, 2015, plaintiff returned to DePaul Hospital for hydration and disconnection of her chemotherapy pump. She looked unwell and stated that she had had diarrhea the previous night and felt constant pressure in her rectum. (Tr. 707.)

On October 20, 2015, she reported feeling better but with significant side effects from chemotherapy. She continued to have arthralgias, myalgias, intermittent rectal pain, and small frequent stools. (Tr. 1218.)

On October 22, 2015, plaintiff felt lightheaded. She returned to DePaul for evaluation of abdominal cramping following her last chemotherapy treatment. She was instructed to drink magnesium citrate, a supplement to treat constipation, and use a Fleet enema. (Tr. 741, 750.)

Plaintiff underwent additional chemotherapy on November 3, 2015. (Tr. 760.) On November 15, 2015 she reported being weak and slightly nauseous, and that she was experiencing decreased sleep and liquid intake. The next day she returned for hydration after being nauseous the previous night. She stated that her arms and legs felt weak and heavy and that she felt lightheaded upon standing. (Tr. 778, 786.)

During follow up on November 17, 2015, plaintiff complained of shortness of breath, myalgia, dizziness, sleep issues, and hair loss. (Tr. 1234.) The next day she received additional chemotherapy. (Tr. 799.) On November 20, 2015, she reported mild nausea with no bowel movement for three days. (Tr. 817.)

At a December 1, 2015, appointment plaintiff reported that she had felt very weak up until Thanksgiving when she started feeling better. (Tr. 826.)

On December 3, 2015, plaintiff reported she felt dizzy upon standing. (Tr. 840.) She was still undergoing chemotherapy and stated that treatment left her feeling tired for

a few days but that she quickly recovered. Her bowels were moving regularly. Examination revealed grossly intact motor function and a normal gait. (Tr. 1485, 1499.)

On December 18, 2015, Denise R. Trowbridge, M.D., state agency consultant, completed a physical residual functional capacity assessment, finding limitations consistent with light work. Dr. Trowbridge believed that her "reporting was credible when made as the treatments reasonably cause symptoms. However, she is tolerating treatment well and there is no current evidence of recurrence or distant metastatic disease." (Tr. 62-64.)

On December 29, 2015, plaintiff was feeling fair with fatigue and constipation for a week following chemotherapy. She described difficulty drinking water because her stomach felt "heavy." Her fingers were sensitive to cold and her feet felt warm and twitched at night. (Tr. 1499.)

On January 11, 2016, plaintiff received additional chemotherapy. She felt fatigued, and had neuropathy and cramping in her legs and feet following treatment. (Tr. 1513.)

On January 22, 2016, plaintiff saw Dr. Hanson for follow-up. She continued to receive chemotherapy and experienced constipation. Examination revealed no neurological deficits and good range of motion and strength in her extremities. (Tr. 1440, 1436.) On January 25, 2016, following chemotherapy, plaintiff experienced weakness, bruising, hot flashes, night sweats, nausea, diarrhea, constipation, myalgia, headaches, dizziness, tingling, sleep issues and hair loss. (Tr. 1527-30.)

Plaintiff completed chemotherapy in January 2016. She saw her oncologist on February 24, 2016. Examination showed no obvious neurological deficits in her arms and her grip was 4/5. Her fatigue had improved and her appetite was better. She continued to have loose stools, urgency, and incontinence. She also complained of continued pain from hemorrhoids, neuropathy in her fingers and toes, and shoulder pain with electric-type pain radiating down her shoulder and right arm. She was advised that

chemotherapy had caused some mild neuropathy and that it would improve. She was started on Gabapentin, used to treat nerve pain. (Tr. 1543-45.)

On April 22, 2016, plaintiff saw Dr. Hanson. She continued to experience urgency and occasional incontinence and neuropathy in her hands and feet. (Tr. 1448-49.)

By May 25, 2016, she continued to experience fatigue, loose stools, neuropathy in her feet, and insomnia. She felt depressed about her neuropathy and inability to work. She was prescribed Cymbalta, for depression and nerve pain. (Tr. 1559-61.)

By August 24, 2016, plaintiff stated she was "doing better" and "overall doing well." Her neuropathy, while still present, was improved. She had some improvement with Cymbalta, although it also caused weight gain, and she was instructed to taper off Cymbalta, and start Wellbutrin, another antidepressant. (Tr. 1581-84.)

On September 8, 2016, x-rays of plaintiff's knees and cervical spine showed minimal degenerative changes. (Tr. 1430.) From September 13 through October 27, 2016, she received physical therapy for low back and other chronic pain. (Tr. 1354-1386.)

On July 19, 2016, plaintiff attended her first psychotherapy session with Terry Miller, licensed professional counselor. She was anxious and fearful of many things. She reported sleeping problems, shortness of breath, nervousness, being shaky, forgetfulness, and memory issues as a result of chemotherapy. (Tr. 1667-68.)

On September 29, 2016, plaintiff told Dr. Hanson that she felt "much better" since completing chemotherapy; however, she continued to report pain around the anus, constipation, and frequent bowel movements. (Tr. 1460.)

On October 17, 2016, plaintiff reported to Ms. Miller that she continued to feel anxious and sluggish in the morning. She stated that she had been sexually assaulted as a child but had never told anyone. She was tearful. She also reported continued neuropathy in her fingers and feet. (Tr. 1666.)

On October 31, 2016, plaintiff reported to Ms. Miller that talking to her was helpful and that she felt that a weight had been lifted off her. She continued to have bowel control issues. (Tr. 1666.)

On November 8, 2016, plaintiff saw Maryam Naemi, D.O., family practitioner, for medication management, bruising, abdominal cramping, and constipation. An x-ray of her thoracic spine revealed minimal multilevel degenerative disease in her midthoracic spine. (Tr. 1418, 1429.)

By November 30, 2016, plaintiff still felt depressed. She continued to have morning pain and stiffness in her shoulders and knees, as well as neuropathy in her feet. Wellbutrin was increased and she continued on Gabapentin. (Tr. 1610-13.)

Plaintiff was "doing better" at a February 28, 2017 appointment with Jamshed Agha, M.D., an oncologist. Dr. Agha noted that her neuropathy was controlled with medication. She still had intermittent constipation and hemorrhoid bleeding. (Tr. 1628-29.)

By April 14, 2017, plaintiff reported feeling good. Her appetite was ok and she had no nausea. She reported fecal urgency and occasional incontinence. (Tr. 1471.)

At a June 12, 2017 counseling appointment, plaintiff stated that several people she knew had recently died from cancer, making her anxious about her own cancer returning. She continued to have inconsistent bowel movements and did not drive far from home due to anxiety about bathroom locations, as well as due to nerve pain in her hands and arm. At a June 26, 2017 counseling appointment, plaintiff reported feeling generally anxious every day and not well physically. (Tr. 1665.)

On June 27, 2017, plaintiff saw Dr. Agha. She reported weight gain and feeling tired all the time. (Tr. 1642-44.)

On July 24, 2017, plaintiff reported to Ms. Miller that she was feeling anxious about leaving her house when she is having intestinal problems, requiring her to have to cancel some events. She was also anxious about memory loss. (Tr. 1664.)

On August 23, 2017, Ms. Miller completed a mental residual functional capacity questionnaire. She diagnosed general anxiety disorder and major depressive disorder related to cancer diagnosis and treatment. (Tr. 1673-77.)

By September 23, 2017, plaintiff told Ms. Miller that she continued to have to cancel events due to bowel issues, and that she was having increased fatigue, anxiety, and irritability. (Tr. 1664.)

**ALJ Hearing**

On September 28, 2017, plaintiff appeared and testified to the following at a hearing before an ALJ. (Tr. 35-56.) She stopped working when she was diagnosed with colon cancer. She has weakness in her legs and arms and neuropathy in her feet and hands. Since her illness she cannot do anything physically, or sit still or follow directions. She has changed mentally and has no focus at all. She is forgetful and has frequent crying spells. She is not able to cook and clean every day. She wakes up tired and her energy level is very low. She naps almost every day between noon and 3:00 p.m. She feels OK when outside walking her dog. She can stand for about fifteen to twenty minutes before she needs to sit down. (Tr. 44-47.)

A vocational expert (VE) also testified at the hearing. The ALJ asked the VE to consider a hypothetical individual limited by what would later form the ALJ's RFC finding. The VE opined that plaintiff would be precluded from her past work, but that that other work would be available in the national economy, including cafeteria attendant, cashier II, and ticket taker. (Tr. 49-51.)

### III.   DECISION OF THE ALJ

On January 24, 2018, the ALJ issued a decision finding that plaintiff was not disabled. (Tr. 10-24.) At Step One of the sequential evaluation, the ALJ found plaintiff had not performed substantial gainful activity during the alleged period of disability. At Step Two, the ALJ found plaintiff's had the severe impairments of residuals of colon

resection due to metastatic adenocarcinoma, chemotherapy-induced peripheral neuropathy, depression, and anxiety. At Step Three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 21.)

At Step Four, the ALJ found plaintiff had the residual functional capacity (RFC) to perform "light" work as defined under the regulations, except that she can occasionally climb ramps and stairs, but never ladders, ropes or scaffolds. She can occasionally stoop and balance, but never kneel, crouch or crawl. She can frequently handle, finger and feel. She must avoid concentrated exposure to vibration. She must avoid all exposure to moving machinery and unprotected heights. She is limited to work that involves only simple, routine repetitive tasks, simple decision making, few workplace changes, and no paced production. (Tr. 23.) With this RFC, the ALJ found plaintiff was unable to perform her past relevant work. At Step Five, the ALJ found there were jobs that exist in significant numbers in the national economy the claimant can perform. Consequently, the ALJ found that plaintiff was not disabled under the Act. (Tr. 28-29.)

## IV. GENERAL LEGAL PRINCIPLES

The Court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings apply the relevant legal standards to facts that are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the Court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or

because the Court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing five-step process).

Steps One through Three require the claimant to prove: (1) she is not currently engaged in substantial gainful activity; (2) she suffers from a severe impairment; and (3) her condition meets or equals a listed impairment.  20 C.F.R. § 404.1520(a)(4)(i)-(iii).  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW).  Id. § 404.1520(a)(4)(iv).  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  Pate-Fires, 564 F.3d at 942.  If the Commissioner determines the claimant cannot return to her PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy.  Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V.  DISCUSSION

### 1. Credibility Evaluation

Plaintiff argues the ALJ erred in his credibility evaluation of her because he failed to consider the factors outlined in Social Security Ruling 16-3p.  She specifically argues the ALJ failed to discuss her bowel urgency or incontinence or that she gets fatigued

easily. She argues the ALJ cites no specific inconsistencies or details why he disbelieves plaintiff's testimony regarding her symptoms and side effects. The court disagrees.

Pursuant to Social Security Ruling 16-3p, when weighing testimony, an ALJ may consider a number of factors, including the medical findings. See SSR 16-3p ("We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record.").

Here, the ALJ found the record evidence did not support plaintiff's allegations of disabling symptoms lasting at least 12 months. (Tr. 25-26.) The ALJ acknowledged that plaintiff had very serious symptoms for a period of time from June 2015 through January 2016 while undergoing surgeries and a course of chemotherapy. (Tr. 25.) However, the record evidence showed that plaintiff recovered by early 2016. This time frame is significant because under the Act, a disability must last or be expected to last for a duration of 12 months. See 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(C)(i).

In December 2015, while plaintiff was undergoing chemotherapy, she reported that chemotherapy left her feeling tired for several days but that she subsequently recovered. (Tr. 1485.) Despite her allegations of neuropathy, examination revealed grossly intact motor function and a normal gait. (Tr. 25, 1499.) In January 2016, examination revealed no neurological deficits and good range of motion and strength in her extremities. (Tr. 25, 1440.) She had normal findings during examinations in April and September 2016 and in April 2017. (Tr. 25, 1452, 1463, 1474.) In February 2016, she had no obvious neurological deficits in her arms and her grip strength was 4/5. (Tr. 1543.) Her examination was unchanged in May, August, and November 2016. (Tr. 25, 1561, 1584, 1613.) Further, CT scans showed no evidence of a return of her cancer. (Tr. 1659.) The court concludes the ALJ lawfully considered that the medical evidence was inconsistent with plaintiff's allegations of disabling symptoms lasting at least 12 months as required under the Act.

Consistent with SSR 16-3p, the ALJ also considered a number of other factors. The ALJ observed that plaintiff's impairments improved with treatment. (Tr. 26-27). While chemotherapy in late 2015 resulted in typical side effects--including fatigue--those symptoms improved once she completed chemotherapy in January 2016. (Tr. 27.) By February 2016, plaintiff reported to her physician that her fatigue and appetite had improved. (Tr. 1543.) Chemotherapy had caused some mild neuropathy, but her doctors believed it would improve. (Tr. 1544.) In May 2016, plaintiff reported continued improvement since completing chemotherapy. (Tr. 1560.) Dr. Agha, her oncologist, was optimistic her neuropathy would continue to improve, and by August 2016, plaintiff indicated that she was doing well and her neuropathy, while still present, was improved. (Tr. 1561, 83.) In November 2016, Dr. Agha indicated that plaintiff's neuropathy continued to improve and her arthralgia was better. (Tr. 1162.) In February and June 2017, Dr. Agha indicated that plaintiff's neuropathy was controlled with medication. (Tr. 27, 1629, 1644.)

Plaintiff also sought treatment for neck, shoulder, and hand pain, and underwent physical therapy in September and October 2016. The record evidence shows that by the end of her therapy, she had made "very good" progress with her range of motion in her spine and a decrease in muscle spasm. She was discharged with a home exercise program. (Tr. 1354-85.) See Hensley v. Colvin, 829 F.3d 926, 933 (8th Cir. 2016) (if an impairment can be controlled by treatment or medication, it cannot be considered disabling.).

The ALJ also noted that plaintiff's daily activities were inconsistent with her subjective allegations. (Tr. 25). Plaintiff told her counselor that she could not work due to neuropathy in her hands that made it difficult for her to do manual work. However, she also told her counselor that she enjoyed gardening and that her daily activities included knitting. (Tr. 24-25, 209, 1666.) Plaintiff also alleged that she could not walk for any significant amount of time, but elsewhere told providers that she walked her dog

at least three to four times a week for 30 minutes at a time, and that her physicians instructed her to increase her exercise. (Tr. 22, 24, 47, 205, 1689, 1694.) Therefore, the ALJ lawfully considered the inconsistencies between plaintiff's daily activities and her reported limitations.

The ALJ also considered plaintiff's allegations of long-term side effects. (Tr. 27, 43.) Plaintiff's physicians indicated that her chemotherapy-related neuropathy improved and was managed with medication. (Tr. 1544, 1561, 1583, 1612, 1629.) The ALJ also observed that plaintiff indicated her fatigue improved significantly once she stopped chemotherapy and that she stopped reporting it as a symptom. (Tr. 25, 1485, 1543, 1558, 1581, 1610, 1627, 1642.) The ALJ lawfully considered the evidence showing a lack of side effects contrary to plaintiff's testimony. See 20 C.F.R. §§ 404.1529(c)(3)(iv) and 416.929(c)(3)(iv); SSR 16-3p.

Based on all of these factors, the ALJ determined that plaintiff's subjective reports were inconsistent with the record as a whole. (Tr. 26-27.) While the ALJ did account for some of plaintiff's symptoms in limiting her to a restricted range of light work with postural, manipulative, environmental, and mental limitations, he lawfully declined to find that her RFC was as limited as she alleged. (Tr. 23.) See Bryant v. Colvin, 861 F.3d 779, 782 (8th Cir. 2017) (RFC need only include limitations that are supported by and consistent with the record as a whole).

As to plaintiff's assertion that the ALJ failed to address her bowel urgency or incontinence, the ALJ did acknowledge that when plaintiff applied for benefits she reported trouble driving, as well as anxiety about leaving her home due to incontinence. (Tr. 24.) However, plaintiff made no mention of her alleged incontinence during the administrative hearing. Second, the record evidence shows that those issues improved once plaintiff recovered from her surgeries. By April 2016, plaintiff reported only some urgency and "occasional" incontinence. (Tr. 1448, 1471.) In May and August 2016, she reported sometimes having several loose stools per day but her physician did not

prescribe any specific treatment. (Tr. 1560, 1583.) In November 2016, plaintiff had no complaints of incontinence or loose stools. (Tr. 1612.) Given the absence of any treatment for loose stools or incontinence, plaintiff failed to meet her burden of showing this would result in significant work-related limitations. See Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013) (ALJ is permitted to issue decision without obtaining additional medical evidence so long as other evidence in the record provides sufficient basis for decision).

Plaintiff also notes she was diagnosed with "failure to thrive." However, as the ALJ discussed, the diagnosis was made in July 2015 when plaintiff was undergoing a series of surgeries for her colon cancer and hemorrhoids and related complications. (Tr. 25, 321, 323, 329.) This was not a longstanding condition. The record evidence showed plaintiff recovered after her final surgery in July 2015. (Tr. 25, 323.)

### 2. Residual Functional Capacity

Plaintiff next argues the RFC is not supported by substantial evidence. Specifically, she argues that the only support for the physical portion of her RFC was a December 2015 opinion from state agency consultant Dr. Denise Trowbridge, and that this opinion failed to account for her later medical treatment. This court disagrees.

Residual Functional Capacity is a function by function assessment of an individual's ability to do work related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 18 (8th Cir. 2001). Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here, the ALJ acknowledged Dr. Trowbridge's opinion, as he was required to under agency regulations, and afforded it partial weight. (Tr. 26-27, 62-64.) See 20 C.F.R. §§ 404.1513(b) and 416.913(b). However, the ALJ also acknowledged that Dr. Trowbridge did not have access to plaintiff's entire medical record. (Tr. 27.) The ALJ then determined that plaintiff's RFC was more limited than suggested by Dr. Trowbridge and included additional restrictions in stooping, kneeling, crouching, crawling, handling, fingering, feeling, and additional environmental restrictions. (Tr. 23.) This demonstrates that the ALJ did not exclusively rely on Dr. Trowbridge's opinion in determining plaintiff's RFC.

The ALJ also considered other opinion evidence in the record but determined that it was not entitled to substantial weight. The ALJ found plaintiff's counselor, Terry Miller, was not an acceptable medical source, and that her treatment notes included few if any medical signs or mental status examination findings to support her opinion. (Tr. 26-27.) See 20 C.F.R. §§ 404.1502, 404.1527(c)(3), 416.902, 416.927(c)(3). Further, Ms. Miller's opinion included physical limitations beyond her area of expertise and that appeared to be based on plaintiff's subjective complaints. See 20 C.F.R. §§ 404.1527(c)(5) and 416.927(c)(5). For all of these reasons, the ALJ lawfully discounted Ms. Miller's opinion.

The ALJ also gave little weight to a medical source statement provided by oncologist Dr. Agha. The ALJ noted that Dr. Agha did not offer any specific exertional functional restrictions and instead simply catalogued many of plaintiff's subjective reports. (Tr. 26, 1681-84.) Thus, the ALJ lawfully discounted Dr. Agha's opinion as well. See Cline v. Colvin, 771 F.3d 1098, 1104 (8th Cir. 2014) (Commissioner may give treating physician's opinion less deference when it is based on claimant's subjective complaints rather than objective medical evidence). The ALJ lawfully considered this opinion evidence, along will the other record evidence, to determine plaintiff's RFC.

Plaintiff also argues that the ALJ erred in stating that her condition improved after she completed chemotherapy. The record evidence shows that plaintiff reported feeling better as her medications were decreased even before she completed chemotherapy. (Tr. 1485.) She reported improvement on multiple occasions following her course of chemotherapy, specifically in February, May, August, September, November 2016, and February and April 2017. (Tr. 1471, 1543, 1560, 1583, 1612, 1460, 1583, 1612, 1628-29). Plaintiff's argument that there was no record evidence that her condition improved after she stopped chemotherapy is inconsistent with substantial evidence in the record. The ALJ lawfully relied on evidence of improvement, as well as other evidence, when determining plaintiff's RFC. (Tr. 25-28.)

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/s/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 18, 2019.